### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY PERSONS, Derivatively on Behalf of MODERNA, INC., | Case No.: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| STEPHANE BANCEL, JAMES M. MOCK, STEPHEN HOGE, NOUBAR AFEYAN, SANDRA HORNING, ELIZABETH NABEL, FRANCOIS NADER, PAUL SAGAN, ELIZABETH TALLETT, ROBERT LANGER, and STEPHEN BERENSON, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| MODERNA, INC., | |
| Nominal Defendant. | |

Plaintiff Timothy Persons ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of and for the benefit of Moderna, Inc. ("Moderna" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint") against Stephane Bancel ("Bancel"), James M. Mock ("Mock"), Stephen Hoge ("Hoge"), Noubar Afeyan ("Afeyan"), Sandra Horning ("Horning"), Elizabeth Nabel ("Nabel"), Francois Nader ("Nader"), Paul Sagan ("Sagan"), Elizabeth Tallett ("Tallett"), Robert Langer ("Langer"), and Stephen Berenson ("Berenson") (collectively, the Individual Defendants, and together with Nominal Defendant Moderna, "Defendants") for breaches of their fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and for violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the

"Exchange Act").

Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as (i) regulatory filings made by Moderna with the U.S. Securities and Exchange Commission ("SEC"), (ii) press releases, transcripts of earnings calls, and other public statements Moderna issued and disseminated, (iii) Moderna's website and marketing materials, (iv) news reports and analyst reports concerning Moderna, (v) publicly available filings in lawsuits based on similar facts and circumstances as those alleged herein, including the securities class action captioned *Wentz v. Moderna, Inc., et al.*, Case No. 1:24-cv-12058 (D. Mass.) (the "Securities Class Action"), and (vi) publicly available materials and data. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Moderna against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from January 18, 2023 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.     In short, and as *Bloomberg Law* reported on August 12, 2024, this action arises out of Moderna's alleged misrepresentations about the effectiveness of its RSV vaccine candidate, causing a stock drop when disappointing results were revealed.

3.     More specifically, the July 2023 biologics license application that Moderna submitted to the US Food and Drug Administration for its vaccine candidate—called mRESVIA or mRNA-1345—indicated an 84% efficacy rate.

4.      But on May 31, 2024, Moderna issued a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection."

5.      Moderna's press release, however, indicated a vaccine efficacy of only ***78.7%***, significantly lower than the 83.7% vaccine efficacy rate that Moderna had previously identified in its July 2023 Biologics License Application rolling submission to the FDA.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the claims asserted herein raise a federal question under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 20(a) of the Exchange Act. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.      This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) Moderna maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial

portion of the transactions and wrongs complained of herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

11.     Plaintiff is, and was at relevant times, a shareholder of the Company.

12.     Nominal Defendant Moderna is a Delaware corporation with principal executive offices located at 325 Binney Street, Cambridge, Massachusetts 02142. The Company's common stock trades on NASDAQ under the ticker symbol "MRNA."

13.     Defendant Bancel has served as Moderna's Chief Executive Officer ("CEO") since October 2011 and as a director of the Company since March 2011. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Bancel received $17,068,514 in total compensation from the Company. Defendant Bancel is a named defendant in the Securities Class Action.

14.     Defendant Mock has served as the Company's Chief Financial Officer ("CFO") since September 2022. For the 2023 Fiscal Year, Defendant Mock received $4,317,185 in total compensation from the Company. Defendant Mock is a named defendant in the Securities Class Action.

15.     Defendant Hoge has served as the Company's President since February 2015 and joined Moderna in January 2013. For the 2023 Fiscal Year, Defendant Hoge received $7,339,166 in total compensation from the Company. Defendant Hoge is a named defendant in the Securities Class Action.

16.     Defendant Afeyan has served as Chairman of the Board of Directors (the "Board") of Moderna since 2012 and as a director since 2010.  Defendant Afeyan is also the Company's co-founder.  He also serves as the chair of the Nominating and Corporate Governance Committee.  For the 2023 Fiscal Year, Defendant Afeyan received $663,519 in total compensation from the Company.

17.     Defendant Horning has served as a director of the Company since 2020.  She also serves as the chair of the Product Development Committee and as a member of the Science and Technology Committee and the Compensation and Talent Committee. For the 2023 Fiscal Year, Defendant Horning received $481,269 in total compensation from the Company.

18.     Defendant Nabel has served as a director of the Company since 2015.  She also serves as the chair of the Science and Technology Committee and as a member of the Product Development Committee and the Compensation and Talent Committee. For the 2023 Fiscal Year, Defendant Nabel received $476,245 in total compensation from the Company.

19.     Defendant Nader has served as a director of the Company since 2019.  He also serves as the chair of the Compensation and Talent Committee and as a member of the Product Development Committee and the Science and Technology Committee. For the 2023 Fiscal Year, Defendant Nader received $481,269 in total compensation from the Company.

20.     Defendant Sagan has served as a director of the Company since 2018.  He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. For the 2023 Fiscal Year, Defendant Sagan received $461,269 in total compensation from the Company.

21.     Defendant Tallett has served as a director of the Company since 2020. She also serves as the chair of Audit Committee and as a member of the Compensation and Talent

Committee. For the 2023 Fiscal Year, Defendant Tallett received $481,269 in total compensation from the Company.

22.     Defendant Langer served as a director of the Company from 2010 through to July 2024. Defendant Langer is also a co-founder of the Company. For the 2023 Fiscal Year, Defendant Langer received $461,269 in total compensation from the Company.

23.     Defendant Berenson served as a director of the Company from 2017 through to July 2024. For the 2023 Fiscal Year, Defendant Berenson received $471,245 in total compensation from the Company.

24.     Defendant Hoge has served as the Company's President since February 2015 and joined Moderna in January 2013. For the 2023 Fiscal Year, Defendant Hoge received $7,339,166 in total compensation from the Company. Defendant Hoge is a named defendant in the Securities Class Action.

25.     Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson are collectively referred to herein as the "Director Defendants."

26.     Defendants Mock, Hoge, and Bancel are collectively referred to herein as the "Officer Defendants."

27.     The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

28.     Moderna, founded in 2010, is a biotechnology company that discovers, develops, and commercializes mRNA therapeutics and vaccines for the treatment of infectious diseases, immune-oncology, rare diseases, autoimmune, and cardiovascular diseases

internationally.

29.    Moderna represents itself to be "a leader in the creation of the field of mRNA medicines." Their purported focus is on "reimagining how medicines are made and transforming how we treat and prevent disease for everyone."

30.    Moderna's products include mRESVIA ("mRNA-1345"), an mRNA Respiratory Syncytial Virus ("RSV") vaccine formulated to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

31.    The Relevant Period begins on January 18, 2023, the day after Moderna issued a press release during post-market hours entitled "Moderna Announces mRNA-1345, an Investigational Respiratory Syncytial Virus (RSV) Vaccine, Has Met Primary Efficacy Endpoints in Phase 3 Trial in Older Adults." The press release stated, in relevant part:

> Moderna [. . .] today announced positive topline data from its ConquerRSV Phase 3 pivotal efficacy trial of mRNA-1345, an investigational mRNA vaccine targeting respiratory syncytial virus (RSV) in older adults. ***Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, including vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms***. Based on these results, Moderna intends to submit for regulatory approval in the first half of 2023.
>
> "Today's results represent an important step forward in preventing lower respiratory disease due to RSV in adults 60 years of age and older. These data are encouraging, and represent the second demonstration of positive phase 3 trial results from our mRNA infectious disease vaccine platform after, Spikevax, our COVID-19 vaccine. We look forward to publishing the full data set and sharing the results at an upcoming infectious disease medical conference," said [Defendant] Bancel[.] "Respiratory diseases are a major public health priority given they have a significant health impact and are a leading cause of hospitalization. For these reasons, in addition to our mRNA-1345 RSV vaccine candidate, we are committed to developing a portfolio of respiratory mRNA vaccines to target the most significant viruses causing respiratory disease, including COVID-19, influenza, and human metapneumovirus." [Emphasis

added).

32.    On January 30, 2023, Moderna issued a press release entitled "Moderna Granted FDA Breakthrough Therapy Designation for mRNA-1345, An Investigational Respiratory Syncytial Virus (RSV) Vaccine Candidate." The press release stated, in relevant part:

Moderna [. . .] today announced mRNA-1345, an investigational mRNA vaccine candidate for respiratory syncytial virus (RSV), has been granted Breakthrough Therapy Designation by the U.S. Food and Drug Administration (FDA) for the prevention of RSV-associated lower respiratory tract disease (RSV-LRTD) in adults aged 60 years or older. The designation was based on positive topline data from the ConquerRSV Phase 3 pivotal efficacy trial.

"The FDA's Breakthrough Designation for mRNA-1345 further emphasizes the significant health impact of RSV in older adults and the high unmet need," said [Defendant] Bancel[.] "With this designation, we look forward to productive conversations with the FDA in the hopes of bringing our RSV vaccine candidate for older adults to the market safely and quickly. Moderna's mRNA platform has now demonstrated two positive Phase 3 infectious disease trial results and we continue to advance a portfolio of respiratory mRNA vaccines targeting the most serious diseases. We are grateful to the FDA for this designation."

The FDA's Breakthrough Therapy Designation is granted to expedite the development and review of drugs that are intended to treat a serious condition, and when preliminary clinical evidence indicates the drug or vaccine may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s).

33.    On February 23, 2023, Moderna issued a press release announcing the Company's financial results for the fourth quarter and full year 2022 financial results. The press release stated, in relevant part:

"2022 was another impressive year for Moderna, with over $19 billion in revenue and significant clinical breakthroughs across our portfolio. We continue to provide our Omicron-targeting bivalent vaccines worldwide, with the latest real-world evidence highlighting the continued protection of our vaccines against hospitalization and death," said [Defendant] Bancel[.] "Our infectious disease platform continues to progress with positive Phase 3 data in RSV for older adults. We are investing to scale Phase 3 manufacturing for personalized cancer vaccines so that we can run several Phase 3 studies simultaneously. With planned R&D investments of $4.5 billion for the year, I am excited about the new medicines we believe we will bring to patients in the coming few years."

***

- ***RSV vaccine in older adults (mRNA-1345) met its primary efficacy endpoint and received Breakthrough Therapy Designation from FDA. mRNA-1345 demonstrated vaccine efficacy of 83.7% against RSV lower respiratory tract disease, defined by 2 or more symptoms, and 82.4% with 3 or more symptoms in older adults.*** mRNA-1345 was generally well-tolerated, with no safety concerns identified by the Data Safety Monitoring Board (DSMB). Based on these results, Moderna expects to submit a Biologics License Application (BLA) for mRNA-1345 to the FDA in the first half of 2023. The pediatric Phase 1 trial of mRNA-1345 is fully enrolled. (Emphasis added).

34.    That same day, Moderna held an earnings call to discuss its fourth quarter and full year 2022 financial results. During the call, Defendant Hoge discussed the RSV vaccines development, stating in relevant part:

> And moving to RSV, as you know, we shared the top line results from our Phase 3 RSV study in older adults earlier this year. And today, we shared additional data that was presented this morning at RSVVW. ***The top line results we have seen are incredibly encouraging and we are grateful to the FDA for breakthrough therapy designation for mRNA-1345, which further emphasizes the significant health impact of RSV in older adults and the high unmet need. In the top line data presented in January, the mRNA-1345 demonstrated 83.7% vaccine efficacy and the primary endpoint of lower respiratory tract disease with two or more symptoms***. 1345 was found to be generally well tolerated and there were no safety concerns identified by the Data and Safety Monitoring Board. (Emphasis added).

35.    On February 24, 2023, Moderna filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Bancel, Mock, Afeyan, Horning, Nabel, Nader, Sagan, Langer, Tallett, and Berenson. The 2022 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bancel and Mock, attesting to the accuracy and truthfulness of the 2022 10-K as well as the accuracy of all financial reporting.

36.    In providing an overview of mRNA-1345, the 2022 10-K stated, in relevant part:

*We are developing an RSV vaccine for children and adults. In older adults, mRNA- 1345 reported positive topline Phase 3 efficacy results in January 2023; in pediatrics, mRNA-1345 is ongoing in a Phase 1 study.*

\*\*\*

mRNA-1345 encodes an engineered form of the RSV F protein stabilized in the prefusion conformation and is formulated in our proprietary LNP. We believe that neutralizing antibodies elicited by mRNA-1345 may lead to an efficacious RSV vaccine.

*Latest data and next steps*

In January 2023, we announced that mRNA-1345 had met primary efficacy endpoints in the pivotal Phase 3 trial in older adults, ages 60 and older. mRNA-1345 demonstrated vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. The other primary efficacy endpoint against RSV-LRTD defined by three or more symptoms was also met, with a VE of 82.4% (96.36% CI: 34.8%, 95.3%; p=0.0078). mRNA-1345 was generally well-tolerated with no safety concerns identified by the DSMB. The overall rate of severe (Grade 3 or greater) solicited systemic adverse reactions was 4.0% for mRNA-1345 and 2.8% for placebo. The overall rate of Grade 3 or greater solicited local adverse reactions was 3.2% for mRNA-1345 and 1.7% for placebo. The study is ongoing, and an updated analysis of safety and tolerability will be provided at the time of regulatory submission.

Based on the positive topline data from the pivotal Phase 3 efficacy trial, the FDA granted mRNA-1345 Breakthrough Therapy Designation for the prevention of RSV-LRTD in adults 60 years or older. We intend to submit mRNA-1345 to the FDA for regulatory approval for older adults in the first half of 2023.

37.    The 2022 10-K provided an overview of Moderna's strategy, stating, in relevant

part:

We believe that the development of mRNA medicines represents a significant breakthrough for patients, our industry and human health globally. Our success in developing a highly effective vaccine against COVID-19, going from sequence selection, conducting clinical trials and to receipt of regulatory authorization for emergency use, all in less than a year, and subsequently receiving BLA approval from the FDA, provides a visible example of the promise of mRNA medicine. The Moderna COVID-19 Vaccine/Spikevax has been authorized for use or approved in over 70 countries. As our first approved product, Spikevax has helped hundreds of millions of people worldwide combat the COVID-19 pandemic. We believe our success in developing our COVID-19

vaccines has positive implications beyond infectious disease vaccines and across our entire pipeline. We currently have 48 programs in development, and our pipeline spans infectious diseases, including vaccines against respiratory diseases, latent diseases and public health pathogens, as well as four therapeutic areas: immuno-oncology, rare diseases, cardiovascular diseases and autoimmune diseases.

In order to deliver on the full scope of the mRNA opportunity and maximize long- term value for patients and investors, we have formulated strategic priorities that guide our near-term and long-term goals:

1. **Execute our commercialization plans for our COVID-19 vaccines.** Our COVID-19 vaccines have been approved in more than 70 countries. We are transitioning to prepare for an endemic, commercial market for COVID-19 vaccines in the United States and other countries. We are working to build a differentiated commercial model, with active commercial subsidiaries across North America, Europe and the Asia- Pacific region, providing us with local commercial teams in key markets around the world.

2. **Build an unrivaled seasonal respiratory vaccine franchise.** As we build our respiratory franchise, we are applying our experience and using our mRNA platform to develop medicines that can help prevent hospitalizations and deaths from the most prevalent respiratory viruses. We are currently developing vaccines against COVID-19, seasonal flu and RSV individually, while pursuing parallel development of combination vaccines. In January 2023, we announced that our older adult RSV vaccine candidate had met its primary efficacy endpoints in a Phase 3 trial. Our long-term vision is to develop, and seek regulatory approval for, a convenient, annual, single-dose booster against as many respiratory viruses as possible. mRNA vaccines have the ability to combine multiple different antigens into one vaccine. We believe that combination vaccines have the potential to improve health outcomes at lower costs due to higher compliance, better uptake, a larger benefit to the healthcare system (including through reduced vaccine administration costs) and increased consumer convenience. We have preparations underway for multiple potential vaccine launches globally over the next several years.

38.     On March 15, 2023, Moderna filed a proxy statement on Form DEF 14A with the SEC (the "2023 Proxy Statement"). Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer,and Berenson solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

39.      The 2023 Proxy Statement called for Moderna shareholders to vote to, *inter alia*:

(1) re-elect Defendants Horning, Sagan, and Berenson to the Board; (2) approve, on a non-

binding, advisory basis, the compensation paid to the Company's named executive officers; and

(3) ratify the selection of Ernst & Young LLP ("EY") as the Company's independent registered

public accounting firm for the 2023 Fiscal Year.

40.      The 2023 Proxy Statement discussed the development of mRNA-1345, stating

in part:

> **Respiratory Vaccine Franchise.** The Board has also overseen our investments
> in programs to enable our goal of developing a seasonal respiratory vaccine
> franchise. As an initial phase of this strategy, during 2022, we advanced one of
> our seasonal flu vaccine candidates (mRNA-1010) into Phase 3 studies in the
> Southern Hemisphere and Northern Hemisphere, ***and we also advanced the***
> ***Phase 3 trial for our vaccine candidate against respiratory syncytial virus (RSV)***
> ***(mRNA-1345) in older adults, which began dosing late in 2021. In January***
> ***2023, we announced positive topline data from our Phase 3 pivotal efficacy trial***
> ***of mRNA-1345. Based on these results, we intend to submit for regulatory***
> ***approvals in the first half of 2023.*** Our longer-term objective is to develop
> combination vaccines against respiratory viruses that combine seasonal
> vaccinations against flu, RSV and COVID-19 into a single vaccination. We
> believe a combination respiratory vaccine will improve coverage while also
> reducing disease burden and producing savings for healthcare systems, both
> through lower cost of administration and lower healthcare costs by preventing or
> reducing the need for care. (Emphasis added).

41.      In a section titled "Board's Role in Risk Oversight," the 2023 Proxy Statement

stated the following, in relevant part:

> Our Board is responsible for overseeing risk management. It exercises its
> oversight primarily through its committees. The full Board (or the appropriate
> committee for risks that are under the purview of a particular committee)
> discusses with management our major risk exposures, their potential impact, and
> the steps we take to manage them. The Board must satisfy itself that the risk
> management processes designed and implemented by management are adequate
> and functioning as intended. When a Board committee is responsible for
> evaluating and overseeing the management of a particular risk, the Chair of that
> committee reports on it to the full Board at regular meetings so the Board can
> coordinate the risk oversight role among the relevant parties.

***

**Audit Committee**
**Primary Risk Oversight**

- The integrity of Moderna's financial statements and related disclosures.
- Moderna's internal control over financial reporting and policies relating to risk assessment and management.
- Moderna's major financial risk exposures and steps taken to monitor and control such exposures, including overseeing treasury and tax operations.
- Policies and procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and whistleblower complaints.
- Internal audit and compliance functions.
- Information security and technology risks, including cybersecurity and related risk management programs.

42.    In a section titled "Governance Documents," the 2023 Proxy Statement stated:

We have adopted a Code of Ethics and Business Conduct that applies to our Board of Directors and all of our officers and employees. In addition, we have adopted Corporate Governance Guidelines that formalize certain fundamental board policies and practices. Both of these documents are available on the "Investors—Governance—Governance Documents" section of our website, https://investors.modernatx.com.

43.    Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

44.    The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) though Moderna claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not

adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

45.    As a result of Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Berenson, Horning, and Sagan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) appoint EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

46.    On April 11, 2023, Moderna issued a press release entitled "Moderna Announces Clinical and Program Updates at 4th Vaccines Day." The press release stated, in relevant part:

**mRNA-1345**

mRNA-1345, Moderna's RSV vaccine candidate, is in an ongoing Phase 2/3, randomized, observer-blind, placebo-controlled case-driven trial (ConquerRSV) in adults aged 60 years and older. In this study, 35,541 participants from 22 countries were randomized 1:1 to receive one dose of mRNA-1345 or placebo.

Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, ***including vaccine efficacy (VE) of 83.7%*** (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms.

Vaccine efficacy was maintained in participants over 70 years of age and participants with comorbidities. mRNA-1345 was well tolerated; solicited adverse reactions were mostly grade 1 or grade 2 in severity. No cases of Guillain-Barre Syndrome (GBS) have been reported.

mRNA-1345 has been granted Breakthrough Therapy Designation (BTD) by the FDA for the prevention of RSV-LRTD in adults aged 60 years or older.

47.    On May 4, 2023, Moderna held an earnings call to discuss its financial results

for the first quarter of 2023. During this call, Defendant Hoge discussed the development of RSV vaccines, in relevant part:

> Moving to RSV, we're pleased by the profile of our vaccine in older adults with high and consistent efficacy against RSV lower respiratory tract disease across populations in our large Phase 3 study.
>
> ***At two recent medical meetings, we've shared data showing our vaccine's efficacy was consistently high across all age groups, including in the oldest adult and in participants with preexisting comorbidities that put them at higher risk***. mRNA- 1345 has also shown a favorable tolerability profile with AEs mostly grade 1 or grade 2, mild to moderate. As we shared during Vaccines Day, today, we have not seen any cases of Guillain-Barré syndrome or other severe demyelinating events in the trial.

48.     On July 5, 2023, the Company issued a press release entitled "Moderna Announces Global Regulatory Submissions For Its Respiratory Syncytial Virus (RSV) Vaccine, MRNA- 1345." The press release stated, in relevant part:

> "We are proud to announce these filings for the use of our RSV vaccine candidate, mRNA-1345, in the European Union, Switzerland, Australia, and the U.S. RSV is a major cause of lower respiratory tract infections in older adults and can cause a significant burden to health systems through hospitalizations and emergency care admissions," said [Defendant] Bancel[.] "Our mRNA platform has allowed us to move from initial clinical testing to our first international Phase 3 trial to initiation of regulatory submissions for mRNA-1345 in just two years, enabling us to tackle this pervasive public health burden with speed and clinical rigor. mRNA-1345 represents the second product coming from our mRNA platform to seek global approval, and with recent positive data in rare disease and cancer, we expect more in the future - further demonstrating the tremendous potential of mRNA to combat disease."

49.     Further, the press release reiterated that "mRNA-1345 met primary efficacy endpoints, demonstrating vaccine efficacy of 83.7% against RSV lower respiratory tract disease in older adults in the Phase 3 pivotal efficacy trial[.]"

50.     On August 3, 2023, Moderna issued a press release announcing the Company's financial results for the second quarter of the 2023 fiscal year. The press release stated, in relevant part:

"Second quarter sales were on target, given the seasonal nature of Covid. I am pleased with the progress our U.S. commercial team has made to get new contracts in place for fall 2023. We are on track to deliver 2023 sales between $6 billion to $8 billion, depending on Covid vaccination rates in the U.S.," said [Defendant] Bancel[.] "Our late-stage clinical pipeline is firing on all cylinders with four infectious disease vaccines in Phase 3, including RSV which was recently submitted to regulators for approval. Our individualized neoantigen therapy is now in Phase 3 for melanoma and our lead rare disease program for PA is in dose confirmation. We believe that all these products should launch in 2024, 2025 or 2026, and we are continuing to invest in scaling Moderna to bring forward an unprecedented number of innovative mRNA medicines for patients."

51.    That same day, Moderna held an earnings call to discuss its second quarter 2023 results. During this call, Defendant Bancel discussed mRNA-1345, stating in relevant part: "[w]e've also started to manufacture mRNA-1345 in preparation for the launch. As a reminder, at launch, these products will be in a prefilled syringe presentation, *which combined with the strong efficacy profile will position very well our product to healthcare professionals*."

52.    Also on the earnings call, Defendant Hoge further discussed the RSV vaccines, stating in relevant part:

> Moving to RSV. As [Defendant Bancel] mentioned earlier, we are pleased to be on track for regulatory approvals in 2024. Earlier this month, we announced a rolling submission to the FDA, and we plan to use a priority voucher to accelerate that review. We also filed additional regulatory applications in Europe, Switzerland, Australia, and the UK. *We're incredibly encouraged by the profile of mRNA-1345 and look forward to the expected commercial launch next year*. (Emphasis added).

53.    On September 13, 2023, Moderna issued a press release entitled "Moderna Expands the Field of mRNA Medicine with Positive Clinical Results Across Cancer, Rare Disease, and Infectious Disease." The press release stated, in relevant part:

### Expanding the Field of mRNA Medicine

> Moderna was founded and built to use nature's information molecule, mRNA, to treat and prevent disease. The premise has always been that an mRNA-based approach to making medicine could advance at the pace of information, leveraging common science, technology, and infrastructure to create medicines addressing high unmet needs at unprecedented speed and efficiency.

Through more than a decade of investment in science, the Company has created the field of mRNA medicine. The Company has advanced a diverse pipeline and demonstrated the potential for clinical benefit in cancer (mRNA-4157), in three different rare diseases (mRNA-3705, mRNA-3927, mRNA-3745), and multiple infectious disease vaccine (mRNA-1273, mRNA-1345, mRNA-1010). The Company has advanced six programs into late-stage development, including two approved or filed for approval, and three more that have completed Phase 3 enrollment. The Company expects to double the number of programs in Phase 3 by 2025 and launch up to 15 products in five years across cancer, rare disease, and infectious disease. Up to four of those launches could come by 2025.

54.    The press release reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

55.    On November 2, 2023, Moderna issued a press release announcing the Company's third quarter financial results for fiscal year 2023, which reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%" and stated, in relevant part:

> *Moderna is preparing for the marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market.* The Company is encouraged by early indications of strong consumer awareness and demand in the RSV market. *Moderna believes that clinical data for its RSV vaccine supports a best-in-class profile and that its ready-to-use pre-filled syringes (PFS) offer another competitive differentiator over currently licensed products, which require multiple preparatory steps by pharmacists and clinicians. Feedback from clinicians and customers in the COVID-19 market, where Moderna has a similar presentation, validates the benefits of PFS administration. The Company's pre-launch activities at this time are largely focused on scientific exchanges and public health engagements.* (Emphasis added).

56.    On December 14, 2023, the Company issued a press release entitled "Moderna Announces New England Journal of Medicine Publication of Pivotal Phase 3 Clinical Safety and Efficacy Data For MRNA-1345, the Company's Investigational Respiratory Syncytial Virus (RSV) Vaccine." The press release stated, in relevant part:

> RSV is a highly contagious virus that causes severe disease across the age

spectrum, including older adults. Each year in the U.S., RSV leads to approximately 60,000- 160,000 hospitalizations and 6,000-10,000 deaths among older adults. Applications for mRNA-1345 have been submitted to regulators around the world. Moderna is actively preparing for an expected 2024 marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market. If approved, mRNA-1345 would have a potential best-in-class profile and be the only ready-to-use RSV vaccine available in single-dose prefilled syringes.

57.     On February 22, 2024, Moderna issued a press release announcing the Company's financial results for the fourth quarter and full year 2023, which again reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

58.     That same day, Moderna held an earnings call to discuss its fourth quarter and full 2023 fiscal year financial results. During the earnings call, Defendant Hoge discussed the RSV vaccines, stating in relevant part:

> Moving to our RSV vaccine candidates, we are very excited about launching the RSV vaccine this year. That will be the launch of our second product. Our mRNA platform is delivering. The FDA PDUFA date is May 12. If the outcome is positive, we anticipate that ACIP will include mRNA-1345 on the agenda in late June.
>
> Let me now turn to our RSV vaccine profile. ***We believe we have the best profile to serve patients and completing the RSV market, efficacy, safety, and ease of use. Our clinical data shows strong vaccine efficacy***. We have a well-established safety and tolerability profile that leverages the same mRNA technology that has been delivered in over 1 billion COVID vaccines. Additionally, we have not seen any case of Guillain-Barre Syndrome or GBS in our Phase 3 trials. (Emphasis added).

59.     On February 23, 2024, Moderna filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Bancel, Mock, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson. The 2023 10-K also contained SOX certifications signed by Defendants Bancel and Mock, attesting to the accuracy and truthfulness of the 2023 10-K as well as the accuracy of all financial reporting.

60.     The 2023 10-K contained substantively similar descriptions of the Company's strategy and overview of mRNA-1345 as discussed in ¶¶ 32-33, 36-37.

61.     On March 21, 2024, Moderna filed its proxy statement on form DEF14 (the "2024 Proxy Statement") with the SEC. Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson solicited the 2024 Proxy Statement and caused its filing pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

62.     The 2024 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Nabel, Tallett, and Langer to the Board; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) ratify the selection of EY as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024 (the "2024 Fiscal Year").

63.     The 2024 Proxy Statement discussed the development of mRNA-1345, stating in part:

> **Respiratory Vaccine Franchise**. *Following the announcement of positive efficacy data for the Company's vaccine candidate against respiratory syncytial virus (RSV) (mRNA-1345) in older adults in January 2023, the Company moved swiftly to apply for approval from regulators in key markets globally.* The Company is anticipating approval and is preparing for commercial launch of this product in 2024. During 2023, the Company advanced Phase 3 studies for three additional respiratory vaccines programs beyond our original COVID-19 and RSV vaccines: seasonal flu (mRNA-1010), next-generation COVID-19, which is designed to be refrigerator-stable (mRNA-1283), and our combination vaccine against seasonal flu and COVID-19 (mRNA-1083). We believe that combination respiratory vaccines have the potential to improve coverage while also reducing disease burden and producing savings for healthcare systems, both through lower cost of administration and lower healthcare costs by preventing or reducing the need for care. (Emphasis added).

64.     In a section titled "Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

Our Board is responsible for overseeing risk management. It exercises its oversight primarily through its committees. The full Board or applicable committee discusses with management our major risk exposures, their potential impact, and the steps we take to manage them. The Board must satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as intended. When a Board committee is responsible for evaluating and overseeing the management of a particular risk, the Chair of that committee reports on it to the full Board at regular meetings so the Board can coordinate the risk oversight role among the relevant parties. The Board's standing committees each having primary oversight for risks related to the areas set forth below.

\*\*\*

**Audit Committee**
**Primary Risk Oversight**

- Ensuring the integrity of Moderna's financial statements and related disclosures.
- Maintaining effective internal control over financial reporting and policies relating to risk assessment and management.
- Mitigating exposure to major financial risks and taking steps to monitor and control such exposures, including overseeing treasury and tax operations.
- Strengthening our cybersecurity program and protection against other technology-related risks.
- Implementation of policies and procedures related to the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters, and handling of whistleblower complaints.
- Ensuring that internal audit and compliance plans are aimed at identifying and mitigating key risks.

65.    In a section titled "Governance Documents," the 2024 Proxy Statement stated:

We have adopted a Code of Ethics and Business Conduct that applies to our Board of Directors and all of our officers and employees. In addition, we have adopted Corporate Governance Guidelines that formalize certain fundamental board policies and practices. Both of these documents are available on the "Governance—Governance Documents" section of our Investor Relations website, https://investors.modernatx.com.

66.    Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345

were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

67.     The 2024 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

68.     As a result of Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson, causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Nabel, Tallett, and Langer to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) appoint EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

69.     On March 27, 2024, Moderna issued a press release entitled "Moderna Advances Multiple Vaccine Programs to Late-Stage Clinical Trials," which again reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

70.     The above-referenced statements were materially false and/or misleading and/or failed to disclose material adverse facts about Moderna's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) mRNA-1345 was less effective than the Individual Defendants had repeatedly

represented to investors; (ii) as a result, the clinical and/or commercial prospects of mRNA-1345 were overstated; and (iii) as a result, the public statements the Individuals Defendants made or caused Moderna to make were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH EMERGES**

71.     On May 31, 2024, Moderna issued a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection."

72.     Moderna's press release, however, indicated a vaccine efficacy of only ***78.7%***, significantly lower than the 83.7% vaccine efficacy rate that Moderna had previously identified in its July 2023 Biologics License Application rolling submission to the FDA.

73.     Market analysts took notice of mRNA-1345's lower-than-expected vaccine efficacy rate following this announcement.  For example, *Reuters* published an article on May 31, 2024 entitled "US FDA approves Moderna's RSV vaccine with lower-than-expected efficacy in its label," which stated, in relevant part:

> The U.S. Food and Drug Administration approved Moderna's (MRNA.O), opens new tab respiratory syncytial virus (RSV) vaccine, the company announced on Friday, giving it a shot at much-needed new revenue from a second product. Moderna's vaccine was approved for the prevention of RSV-associated lower respiratory tract disease in adults aged 60 or older, ***but with a label indicating the shot was 79% effective at preventing at least two symptoms of RSV, such as cough*** and fever.
>
> Moderna had filed for FDA approval in July on data from a late-stage trial that showed its vaccine was 84% effective at preventing those symptoms, and its shares were down more than 6% in afternoon trading.  (Emphasis added).

74.     On this news, Moderna's stock price fell $8.94 per share, or 5.9%, to close at $142.55 per share on May 31, 2024.

75.    Then, on June 26, 2024, Moderna disclosed, in a presentation before the CDC's Advisory Committee on Immunization Practices, that after 18 months, mRNA-1345 proved only 49.9% to 50.3% effective against multiple symptoms of lower respiratory tract disease—a significantly lower efficacy rate than vaccines produced by Moderna's competitors.

76.    Again, analysts took notice of mRNA-1345's reduced efficacy rate following this presentation.  For example, in an article entitled "Moderna says its RSV shot is 50% effective across a second season," *Reuters* stated, in relevant part:

> Moderna [. . .] opens new tab respiratory syncytial virus (RSV) shot mRESVIA showed 50% efficacy in preventing RSV after 18 months, the drugmaker said on Wednesday.
>
> In their clinical trials, GSK's RSV vaccine Arexvy was 78% effective in preventing severe RSV over a second year and Pfizer's was 78% effective through a second RSV season.
>
> Moderna presented the data at a meeting of the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices. The drugmaker has previously cautioned against comparing its vaccine to rivals, noting that the trials were not head-to-head and used different case definitions for RSV disease.

77.    Similarly, *Bloomberg* published an article entitled "Moderna RSV Vaccine Efficacy Sinks Over Time, CDC Documents Show," which stated, in relevant part:

> Moderna [. . .] shares sank after new data showed the efficacy of its RSV shot fell sharply in the second year and was lower than that of rival vaccines.
> The results could further raise doubts over the prospects for its shot, which is already third to the market. Moderna shares fell as much as 11%, their biggest intraday decline since November.
>
> Moderna's shot dropped from 55% efficacy over the first 12 months to 36% in the second year in patients with at least three "lower respiratory" symptoms of RSV, according to documents posted Wednesday on the Centers for Disease Control and Prevention website.
>
> ***
> Jefferies analyst Michael Yee said in a research note that Moderna's new figures were "on the lower end of expectations," while pointing out that comparisons were difficult because the companies studied their vaccines during different

seasons.

78.     On this news, Moderna's stock price plummeted $15.15 per share, or 11.01%, to close at $122.45 per share on June 26, 2024.

<strong><u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u></strong>

79.     As officers and directors of Moderna, and because of their ability to control the business and corporate affairs of Moderna, the Individual Defendants owed to the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Modern in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Moderna and its shareholders so as to benefit all shareholders equally.

80.     Each director and officer of Moderna owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

81.     The Individual Defendants, because of their positions of control and authority as officers and directors of Moderna, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

82.     To discharge their duties, the officers and directors of Moderna were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the company.

83.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Moderna, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Moderna's Board at all relevant times.

84.      As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

85.      The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

86.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

87.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

88.    To discharge their duties, the officers and directors of Moderna were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Moderna were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true

financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

(g)    refrain from unduly benefiting themselves or other Moderna insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

89.    Each of the Individual Defendants further owed to Moderna and the shareholders the duty of loyalty requiring that each favor Moderna's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position,

influence, or knowledge of the affairs of the Company to gain personal advantage.

90.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Moderna and were at all times acting within the course and scope of such agency.

91.    Because of their advisory, executive, managerial, and directorial positions with Moderna, each of the Individual Defendants had access to adverse, non-public information about the Company.

92.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Moderna.

## CORPORATE GOVERNANCE

93.    At all relevant times, Moderna had extensive corporate governance documents in place imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.

94.    Each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

## CODE OF CONDUCT

95.    At all relevant times, Moderna had in place its Code of Ethics & Business Conduct ("Code of Conduct"), which "applies to all directors, officers, employees, contractors and anyone who conducts business for on behalf of Moderna."

96.    The Code of Conduct opens with a message from Defendant Bancel which states, "The Moderna Code of Ethics and Business Conduct is our guide to how we conduct ourselves and our activities globally."

97.    In a section entitled "We Protect Patients," the Code of Conduct states the

following, in relevant part:

We Advance Science Responsibly

Nothing is more important to Moderna than the health and safety of those who receive our medicines. We are proud to advance healthcare through our research and development. We maintain high ethical and scientific standards, ensuring that our products are considered safe and effective for the benefit of society.

\*\*\*

We Prioritize Patients and the Communities We Serve

Patients and healthcare providers rely on our information, so we must act objectively, responsibly and transparently when we interact with them. Every decision we make is in service of delivering on the promise of mRNA.

\*\*\*

We Communicate Accurately

We are honest and transparent in our communications. Sharing accurate scientific information is vital to improving health across the world. The integrity of our information assures regulators and patients that our products are not misrepresented.

98.     In a section entitled "We Build Trust," the Code of Conduct states:

We Act Legally and Ethically

We do business the right way and make decisions ethically, and by doing this we build trust in Moderna and maintain our reputation.

\*\*\*

We Conduct Our Business with Transparency

We build trustworthy relationships with all stakeholders, including government officials, policymakers, trade associations or advocacy organizations, and we act with clear intent.

We build trust by transparently sharing information to enable well-informed public policy decisions and legislation that continues to promote innovation.

## **PRODUCT DEVELOPMENT COMMITTEE CHARTER**

99.     At all relevant times, Moderna had in place its Product Development Committee

Charter, which set forth certain duties and responsibilities on the Product Development Committee members: Defendants Horning; Nabel; and Nader.

100.    The Product Development Committee Charter states that the Committee has the following oversight responsibilities over "R&D Strategy and Product Development Assets and Programs":

- Review, evaluate and advise the Board regarding:

  o the Company's R&D and product development strategy, assets and pipeline and the progression of the Company's development programs, including target product profile, "go/no go" to next phase criteria, clinical trial design and adherence to project timelines; the impact of a dynamic competitive landscape on the strategy and product development programs;

  o the allocation, deployment, utilization of and investment in the Company's scientific assets;

  o the advancement of any program to investment in a pivotal trial;

  o investments in and development of the Company's technological development strategies;

  o the Company's regulatory efforts and strategy;

  o the risks associated with the Company's R&D and product development programs and regulatory matters and their management; and

  o the quality of operational capabilities, to include systems to monitor and control the quality and safety of the Company's products and product candidates at all stages of the product life cycle.

## AUDIT COMMITTEE CHARTER

101.    At all relevant times, Moderna had in place its Audit Committee Charter which set forth certain duties and responsibilities on the Audit Committee members: Defendants Sagan; Tallett; and Berenson.

102.    With respect to "Audited Financial Statements and Annual Audit," the Audit

Committee Charter provides, in relevant part:

 • The Audit Committee shall review the overall audit plan (both external and internal (if any)) with the independent auditors, the internal auditors (if any) and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

 • The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors the Company's annual audited financial statements and related disclosures prior to the filing of the Company's Annual Report on Form 10-K, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

 • The Audit Committee must review:

(i)      any analyses prepared by management, the internal auditors (if any) and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii)     major issues, if any, as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii)    major issues, if any, regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv)     the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

• The Audit Committee shall coordinate the oversight and review the adequacy of the Company's internal control over financial reporting.

103.    With respect to "Earnings Press Releases," the Audit Committee Charter states that "The Audit Committee shall review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information)."

104.    In discussing "Legal and Regulatory Compliance," the Audit Committee Charter states:

• The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements.  After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

• The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

## DAMAGE TO MODERNA

105.    On August 30, 2024, the Securities Class Action was initiated in this Court against the Company and the Officer Defendants. This complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's current and/or former officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

106.    The Individual Defendants failure to exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, conduct business in a fair and transparent manner, and meet their additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they received lucrative compensation, caused harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

107.    Moderna will suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

108.    Moderna will suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

109.    As a direct and proximate result of the Individual Defendants' conduct, Moderna has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and the Individual Defendants' misrepresentations.

### SHARE REPURCHASES

110.    In addition to the harm specified above, the Individual Defendants further damaged Moderna by causing the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

111.    On February 22, 2022, Moderna's Board authorized a share repurchase program

of the Company's common stock, with no expiration date, for up to $3.0 billion. On August 1, 2022, Moderna's Board authorized an additional increase of $3.0 billion under the repurchase program for the Company's common stock, with no expiration date.

112.     Pursuant to the stock repurchase plan, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company:

| Date Range | Shares Repurchased | Average Price Paid Per Share | Approximate Total Price Paid |
|---|---|---|---|
| March 1-31, 2023 | 3,618,461 | $145.31 | $525,798,568 |
| April 1-30, 2023 | 2,702,957 | $146.71 | $396,550,821 |
| May 1-30, 2023 | 1,727,343 | $132.90 | $229,563,885 |
| TOTAL | 8,048,761 | ------------- | $1,151,913,274 |

113.     As the value per share on June 26, 2024 – when the truth was revealed – was $122.45 per share, Moderna should have paid $985,570,784 for its share repurchases. The Individual Defendants, however, caused the Company to repurchase its shares overpaying by approximately **$166,342,490** as the stock price was inflated by the Individual Defendants' false and misleading statements.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

114.     Plaintiff brings this action derivatively in the right and for the benefit of Moderna to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' wrongful conduct as alleged herein.

115.     Moderna is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

116.     Plaintiff is a current owner of Moderna common stock and has been a continuous shareholder of the Company's common stock at all relevant times. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

117.    Plaintiff will adequately and fairly represent the interests of Moderna and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

118.    As of the commencement of this action, Moderna's Board is comprised of nine members – Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, and Non-Parties Abbas Hussain and David M. Rubenstein (collectively, the "Current Directors"). Plaintiff is required to show that a majority of the Current Directors cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

119.    Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand is a futile and useless act and, therefore, excused, because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability.

120.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted Moderna to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

121.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

122.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory

obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

123.    As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

124.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

125.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

126.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

127.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed and refused to seek recovery for Moderna for any of the misconduct alleged herein.

128.    Furthermore, despite having knowledge of their own misconduct and the Company's resulting artificially inflated share price, the Director Defendants authorized the harmful share repurchase plan and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

129.    Defendant Bancel is not disinterested or independent, and therefore, is incapable of considering demand because as CEO of Moderna is an employee of the Company deriving substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Bancel cannot independently consider any demand to sue himself for breaching his fiduciary duties to Moderna, because that would expose him to liability and threaten his livelihood.

130.    The 2024 Proxy Statement acknowledges that Defendant Bancel is not independent. As Moderna's CEO, Bancel fails NASDAQ's bright-line independence test and cannot be considered independent. As such, Defendant Bancel could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Bancel is therefore futile.

131.    Defendant Bancel also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein,

Defendant Bancel is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

132.    In addition, Defendant Bancel receives lucrative compensation in connection with his employment with the Company. Thus, Defendant Bancel is not independent from Defendants Nabel, Nader, and Tallett as they comprise the Compensation and Talent Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Bancel. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Bancel could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

133.    Because of Defendant's Bancel's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Bancel is unable to comply with his fiduciary duties and prosecute this action. Defendant Bancel is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and the Securities Class Action, where he is a named defendant.

134.    Defendant Afeyan is one of the Co-Founders of Moderna along with Defendant Langer. As such, Defendant Afeyan is irreconcilably conflicted and could not consider a demand to sue those who have helped build and run the Company he founded. In addition, between 2015 and 2019, Defendants Afeyan and Langer both served as directors of Rubius Therapuetics. As such, Defendant Afeyan could not reasonably bring a lawsuit against another Defendant Langer particularly given as they have a longstanding professional relationship with each other.

135.    Defendant Afeyan also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Afeyan is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

136.    Defendant Afeyan is also incapable of considering a demand to sue the Individual Defendants as a result of his longstanding professional relationships with Defendants Bancel and Berenson.  Specifically, Defendant Afeyan founded, and serves as Managing Partner and CEO, of Flagship Pioneering.  Meanwhile, Defendant Berenson serves as a Managing Partner of Flagship Pioneering, and Defendant Bancel serves as a Venture Partner of Flagship Pioneering. As such, Defendant Afeyan could not reasonably consider a demand to sue those Defendants who he hired, and who help him run Flagship Pioneering.

137.    In addition, Defendant Afeyan's relationship with Defendant Berenson is further strengthened from their concurrent directorships of Seres Therapeutics. Indeed, Defendant Afeyan served as a director of Seres Therapeutics from 2012 through to 2020 while Defendant Berenson has served as a director of Seres Therapeutics since 2019. Accordingly, Defendant Afeyan has a close working relationship with Defendant Berenson and could not consider a demand to sue.

138.    Defendants Tallett and Bancel could not consider a demand to sue one another as a result of their longstanding professional relationship, starting in at least 2013. Both Defendants Tallett and Bancel concurrently served as directors of Qiagen, Inc. with Defendant Tallett serving on Qiagen's board since 2011 and Defendant Bancel serving on Qiagen's board from 2013 through to 2021. As a result, Defendants Bancel and Tallett cannot consider a demand

to sue each other given this professional relationship.

139.    Defendants Tallett and Sagan, during the Relevant Period, served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

140.    Defendants Tallet and Sagan breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Tallett and Sagan face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

141.    Defendants Tallett and Sagan also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as main perpetrators of the wrongdoing alleged herein, Defendants Tallett and Sagan are irreconcilably conflicted, face a substantial likelihood of liability, and cannot consider a demand to sue.

142.    Defendants Horning, Nabel and Nader, during the Relevant Period, served as members of the Product Development Committee.  As discussed *supra*, the Product Development Committee are responsible for the Company's R&D and product development strategy, assets and pipeline and the progression of the Company's development programs, as well as the Company's

regulatory efforts and strategy. Defendants Horning, Nabel, and Nader breached their fiduciary duties by permitting the Company to make the false and misleading statements regarding the effectiveness and commercial prospects of mRNA-1345. Therefore, Defendants Horning, Nabel and Nader face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

143.    Defendants Horning, Nabel, and Nader also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as main perpetrators of the wrongdoing alleged herein, Defendants Horning, Nabel, and Nader are irreconcilably conflicted, face a substantial likelihood of liability, and cannot consider a demand to sue.

144.    Moderna has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby. As indicated by the lack of action to recover for the Company to date, any demand upon the Board is futile.

145.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

146.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

147.     The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

148.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

149.     Publicly traded companies, such as Moderna, typically carry director and officer

liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

150.    Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIM I

### Against the Individual Defendants for Breach of Fiduciary Duties

151.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants owe Moderna fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

153.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

154.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing Moderna to improperly misrepresent the Company's publicly reported financials to the investing public and to Moderna shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's

SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place.

155.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

156.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Moderna has sustained significant damages.

157.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, Moderna has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending itself in the Securities Class Action and potential class-wide damages, severe damage to the stock price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

158.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Gross Mismanagement

159.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

160.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

161.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant

damages in excess of hundreds of millions of dollars.

162.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## CLAIM III

### Against the Individual Defendants for Waste of Corporate Assets

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

166.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) authorizing a harmful share repurchase program and causing the Company to repurchase its own common stock at artificially inflated prices.

167.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## CLAIM IV

### Against The Individual Defendants for Unjust Enrichment

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, Moderna.

171. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

172. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173. Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## CLAIM V

### Against the Individual Defendants for Abuse of Control

174. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

175. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Moderna, for which they are legally responsible.

176.    As a direct and proximate result of the Individual Defendants' abuse of control, Moderna has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

### CLAIM VI

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and supervision of Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett, the 2023 and 2024 Proxy Statements failed to disclose that, contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's risk

oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

182.    The 2023 and 2024 Proxy Statements also failed to disclose that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

183.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements, including but not limited to, the reelection of Defendants Berenson, Horning, Sagan, Langer, Nabel, and Tallett to the Board.

184.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the reelection of Defendants Berenson, Horning, and Sagan to the Board, which allowed them to continue to breach their fiduciary duties to Moderna.

185.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the reelection of Defendants Langer, Nabel, and Tallett to the Board, which allowed them to continue to breach their fiduciary duties to Moderna.

186.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

187.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## CLAIM VII

**Against the Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

188.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

189.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

190.    The Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Moderna, their control over, and/or receipt and/or modification of Moderna's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Moderna, participated in the fraudulent scheme alleged herein.

191.    The Individual Defendants knew and/or recklessly disregarded the false and

misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

192.    The Individual Defendants were each members of Moderna's Board and senior management team during the aforesaid time period. Based on their roles at Moderna, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

193.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Moderna, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

194.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

195.    As such the Individual Defendants caused the Company to violate section 10(b)

of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## CLAIM VIII

### Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act of 1934

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Individual Defendants, by virtue of their positions with Moderna and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Moderna and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Moderna to engage in the illegal conduct and practices complained herein.

199.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in

favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.      Awarding punitive damages;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: November 5, 2024

**THE ROSEN LAW FIRM, P.A.**

/s/ Joshua Baker
Joshua Baker (BBO #695561)
101 Greenwood Avenue, Suite 400
Jenkintown, Pennsylvania 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com

*Local Counsel for Plaintiff*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Email: guiney@whafh.com

*Counsel for Plaintiff*

## VERIFICATION

I, Timothy Persons am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/22/2024

Signed by:

*Timothy Persons*

7E242BD00862448

Timothy Persons